1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                         FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   KEITH CHANDLER,                              No.  2:11-cv-1969 JAM CKD P

12              Plaintiff,                        ORDER AND

13        v.                                      FINDINGS AND RECOMMENDATIONS

14   HAMMONS, Correctional Officer,

15              Defendant.

16

17   I.  Introduction

18        Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to 42

19   U.S.C. § 1983.  This action is proceeding on the complaint filed July 26, 2011 (ECF No. 1

20   ("Compl.")), which alleges that defendant failed to respond appropriately to plaintiff's breathing

21   difficulties on December 26, 2008, resulting in an asthma attack.  The court found that plaintiff

22   stated an Eighth Amendment deliberate indifference claim as to defendant.  (ECF No. 8.)

23   Pending before the court is defendant's February 15, 2013 motion for summary judgment (ECF

24   No. 22), which is fully briefed (ECF Nos. 23, 26).  For the following reasons, the court will

25   recommend that defendant's motion be granted.

26   II.  Summary Judgment Standards Under Rule 56

27        Summary judgment is appropriate when it is demonstrated that there "is no genuine

28   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

1

1    Civ. P. 56(a).  A party asserting that a fact cannot be disputed must support the assertion by

2    "citing to particular parts of materials in the record, including depositions, documents,

3    electronically stored information, affidavits or declarations, stipulations (including those made for

4    purposes of the motion only), admissions, interrogatory answers, or other materials. . ."  Fed. R.

5    Civ. P. 56(c)(1)(A).

6         Summary judgment should be entered, after adequate time for discovery and upon motion,

7    against a party who fails to make a showing sufficient to establish the existence of an element

8    essential to that party's case, and on which that party will bear the burden of proof at trial.  See

9    Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[A] complete failure of proof concerning an

10   essential element of the nonmoving party's case necessarily renders all other facts immaterial."

11   Id.

12        If the moving party meets its initial responsibility, the burden then shifts to the opposing

13   party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita

14   Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

15   existence of this factual dispute, the opposing party may not rely upon the allegations or denials

16   of their pleadings but is required to tender evidence of specific facts in the form of affidavits,

17   and/or admissible discovery material, in support of its contention that the dispute exists or show

18   that the materials cited by the movant do not establish the absence of a genuine dispute.  See Fed.

19   R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the

20   fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

21   governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,

22   Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

23   genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

24   party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

25        In the endeavor to establish the existence of a factual dispute, the opposing party need not

26   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

27   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

28   trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

2

1   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

2   Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

3   amendments).

4       In resolving the summary judgment motion, the evidence of the opposing party is to be

5   believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the

6   facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475

7   U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

8   obligation to produce a factual predicate from which the inference may be drawn.  See Richards

9   v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

10  (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

11  simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

12  taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

13  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

14  III.  Analysis

15  A.  Facts

16      Plaintiff alleges that defendant was deliberately indifferent to his serious medical needs in

17  the lead-up to an asthma attack plaintiff suffered on December 26, 2008.  At around 8 a.m. that

18  morning, plaintiff, who had been diagnosed with asthma, began having difficulty breathing.  At

19  10:15 a.m., plaintiff suffered an asthma attack and was taken to the prison clinic for medical

20  treatment.  Plaintiff essentially alleges that defendant, who was informed of plaintiff's breathing

21  problems by another inmate, was responsible for the two-plus hour delay in treatment and

22  plaintiff's resulting asthma attack.  At 10:15 a.m., plaintiff was taken to the prison medical clinic

23  on a gurney, treated with an inhaler containing asthma medication, and released.  (See Compl. at

24  3-13.)

25      Having reviewed the record, the court determines that the following facts are undisputed,

26  except where indicated otherwise:

27  /////

28  /////

Plaintiff's Asthma

At all relevant times, plaintiff was housed at California State Prison-Sacramento, where defendant was employed as a correctional officer.  Prior to the events of December 26, 2008, plaintiff had been diagnosed with allergic rhinitis and asthma.

Allergic rhinitis refers to symptoms of a stuffy and runny nose that occur when a person breathes in something that he or she is presumed allergic to, such as dust, dander, or pollen. Asthma refers to the reversible constriction of small airways in the lung that occur under a variety of circumstances.  Triggers include exercise, cold weather, and exposure to allergens.  Asthma is a chronic, intermittent condition with flare-ups that vary from mild to serious.  The medical therapy for asthma consists of two major classes of drugs: (1) long-term control medication (most often inhaled steroids) to prevent symptoms and (2) a quick-relief medication to abort asthma symptoms, also known as a rescue inhaler.

As of April 2008, plaintiff had been provided several medications for asthma and rhinitis, which he was allowed to keep on his person and use as prescribed.  In August 2008, plaintiff's asthma was described in medical records as mild and persistent.  By November 2008, plaintiff's asthma appeared to be in poor control.  In a health services request form submitted November 14, plaintiff stated his belief that the cold weather "ha[d] a lot to do with it."  On November 25, plaintiff told the doctor that his Asmanex inhaler – a long-term, twice-daily treatment – had "run out."  An order was placed for plaintiff to receive an Asmanex inhaler and an albuterol inhaler (another daily treatment that also functioned as a quick-acting rescue medicine).  As these orders did not expire until early January and late February 2009, respectively, plaintiff should not have been out of either medication as of December 26, 2008.

At his next medical visit on December 24, 2008, plaintiff reported that he was better, even though he had not yet learned to use the long-term treatment as directed.  A peak expiratory flow (PEF) meter is used to test lung performance in asthma patients.  On December 24, 2008, plaintiff's PEF was 475, or 95 percent of his personal best and nearly 80 percent of the predicted peak flow for non-asthmatic men of his height and weight.

/////

4

<u>December 26, 2008</u>

On December 26, 2008, defendant Officer Hammons was working relief for another officer as the Second Watch Control Booth Officer in Facility C, Building Five, where plaintiff was housed.  Non-defendant Officer Scruggs was a floor officer in the building.

After breakfast, plaintiff's building was released for yard exercise at about 8:00 a.m. Around that time, plaintiff asked inmate Walker, the Building Five porter, to tell defendant Hammons to contact the Facility C medical clinic because he was having difficulty breathing. Walker informed defendant, who was working in the control booth.

Defendant, who did not know that plaintiff had asthma, called the medical clinic and was told that he should not send plaintiff to the clinic at that time; rather, plaintiff should be told to fill out a health care services request and then come to the clinic when yard was released.  Defendant relayed this information to the porter, who relayed it to plaintiff.

Plaintiff told the porter to tell defendant that his inhaler was empty, that medical staff were aware of his asthma, and that doctors had told him to inform an officer if he felt he was having an asthma attack coming on.  The porter told defendant several times that plaintiff was having difficulty breathing and that he needed an "asthma inhaler" or a "breathing treatment," but defendant told plaintiff that yard release was in one hour.

At approximately 10:15 a.m., plaintiff's breathing problems worsened and he had an asthma attack.  Plaintiff's cellmate asked the porter to call "Man Down," which he did.  Officer Scruggs went to the cell and saw plaintiff lying on the lower bunk having an asthma attack. Defendant let plaintiff's cellmate out of the cell.  Medical staff responded to the alarm, removed plaintiff from the cell, took his vital signs, and then transported him to the Treatment and Triage Area ("clinic") on a gurney.

The parties give differing accounts of the severity of plaintiff's asthma attack and at what point a nurse took plaintiff's vital signs, which were normal and did not show that he was in any acute distress.  Plaintiff's vital signs showed that his oxygen saturation was 98 and his PEF was 450, which was 90 percent of his personal best and almost 80 percent of his predicted peak flow. Plaintiff asserts that medical staff checked his vital signs after he received treatment.  However, in

1    a sworn declaration, non-defendant S. Joseph, the Registered Nurse on duty that day, states that

2    plaintiff's vital signs were checked before treatment, which is standard practice.

3         Plaintiff asserts that, upon arrival at the clinic, he could not answer medical staff's

4    questions because he was struggling to breathe.  Joseph asserts that while another nurse checked

5    plaintiff's vital signs, Joseph asked him questions and plaintiff responded that he was having pain

6    when breathing over the left side of his chest.  On examination, Joseph noted that he had wheezes

7    on both sides of his chest.  Joseph spoke to non-defendant Dr. Ma, also on duty, who ordered an

8    albuterol inhaler.  Joseph asserts that, immediately after using the inhaler, plaintiff reported that

9    he felt better.

10        When Dr. Ma examined plaintiff after his treatment, he noted that plaintiff's vital signs

11   were normal, that he was in no apparent distress, that he had no difficulty breathing, and that he

12   could speak in complete sentences without shortness of breath.  Dr. Ma noted a mild wheezing on

13   expiration, however.  He diagnosed a mild exacerbation of asthma and confirmed that plaintiff

14   felt better after the breathing treatment.  Dr. Ma ordered plaintiff to continue his Asmanex and

15   albuterol inhalers, ordered medication refills, and ordered a follow-up visit in the clinic in two

16   weeks or sooner if needed.

17        Plaintiff states that he spent approximately an hour in the clinic before returning to his

18   cell.  In contrast, defendant states that he saw plaintiff return to the housing unit about fifteen

19   minutes after being taken to the clinic.  Plaintiff was walking and in no apparent distress at that

20   time.  However, plaintiff was feeling "mentally and emotionally disturbed about the entire

21   incident."

22   Aftermath

23        Two days after his asthma attack, plaintiff requested a follow-up medical visit.  The nurse

24   who examined him documented normal vital signs, including a normal respiratory rate.  The

25   nurse wrote that plaintiff was seen by the doctor, who described clear lungs and stable vital signs.

26        In subsequent medical visits in 2009, physicians continued to monitor plaintiff's asthma

27   and prescribe medication to control it.  In March 2009, two medical exams of plaintiff indicated

28   that his respiratory condition was normal and he had no apparent difficulty breathing.  The

1   following month, medical tests indicated that plaintiff's asthma was well-controlled by

2   medication.

3          In his complaint filed in July 2011, plaintiff alleges that as a result of the December 26,

4   2008 incident, he continues to suffer internal pain and mental anguish.

5   B.   Legal Standard

6          Denial or delay of medical care for a prisoner's serious medical needs may constitute a

7   violation of the prisoner's Eighth and Fourteenth Amendment rights.  Estelle v. Gamble, 429 U.S.

8   97, 104-05 (1976).  An individual is liable for such a violation only when the individual is

9   deliberately indifferent to a prisoner's serious medical needs.  Id.; see Jett v. Penner, 439 F.3d

10  1091, 1096 (9th Cir. 2006); Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002); Lopez v.

11  Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000).

12         In the Ninth Circuit, the test for deliberate indifference consists of two parts.  Jett, 439

13  F.3d at 1096, citing McGuckin v. Smith, 974 F.2d 1050 (9th Cir. 1991), overruled on other

14  grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).  First, the

15  plaintiff must show a "serious medical need" by demonstrating that "failure to treat a prisoner's

16  condition could result in further significant injury or the 'unnecessary and wanton infliction of

17  pain.'"  Id., citing Estelle, 429 U.S. at 104.  "Examples of serious medical needs include '[t]he

18  existence of an injury that a reasonable doctor or patient would find important and worthy of

19  comment or treatment; the presence of a medical condition that significantly affects an

20  individual's daily activities; or the existence of chronic and substantial pain.'"  Lopez, 203 F. 3d

21  at 1131-1132, citing McGuckin, 974 F.2d at 1059-60.

22         Second, the plaintiff must show the defendant's response to the need was deliberately

23  indifferent.  Jett, 439 F.3d at 1096.  This second prong is satisfied by showing (a) a purposeful act

24  or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the

25  indifference.  Id.  Under this standard, the prison official must not only "be aware of facts from

26  which the inference could be drawn that a substantial risk of serious harm exists," but that person

27  "must also draw the inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  This "subjective

28  approach" focuses only "on what a defendant's mental attitude actually was."  Id. at 839.  A

1    showing of merely negligent medical care is not enough to establish a constitutional violation.

2    Frost v. Agnos, 152 F.3d 1124, 1130 (9th Cir. 1998), citing Estelle, 429 U.S. at 105-106.  A

3    difference of opinion about the proper course of treatment is not deliberate indifference, nor does

4    a dispute between a prisoner and prison officials over the necessity for or extent of medical

5    treatment amount to a constitutional violation.  See, e.g., Toguchi v. Chung, 391 F.3d 1051, 1058

6    (9th Cir. 2004); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).  Furthermore, mere delay of

7    medical treatment, "without more, is insufficient to state a claim of deliberate medical

8    indifference."  Shapley v. Nev. Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).

9    Where a prisoner alleges that delay of medical treatment evinces deliberate indifference, the

10   prisoner must show that the delay caused "significant harm and that Defendants should have

11   known this to be the case."  Hallett, 296 F.3d at 745-46; see McGuckin, 974 F.2d at 1060.

12   C.  Discussion

13         Defendant argues that he cannot be found deliberately indifferent for simply following the

14   instructions of medical staff to have plaintiff fill out a sick-call slip and come to the clinic when

15   yard was released.  Plaintiff asserts that, after the porter repeatedly told defendant that plaintiff

16   was having trouble breathing, defendant should have contacted medical staff again or called a

17   floor officer to check on him.

18         Even assuming arguendo that defendant's failure to do more in response to the porter's

19   information constituted deliberate indifference, plaintiff has failed to show that the delay in

20   treatment caused significant harm.  The record indicates that immediately after his breathing

21   problems developed into an asthma attack, plaintiff was taken to the clinic and administered

22   medication by inhaler, which promptly alleviated his symptoms.  The doctor who examined

23   plaintiff did not find he had suffered a major asthma attack.  After treatment, plaintiff's vital signs

24   and breathing returned to normal except for mild wheezing.  Plaintiff was then released from the

25   clinic and walked to his cell in no apparent distress.  In the following months, plaintiff was seen

26   multiple times by medical staff and prescribed effective medication for his asthma.  In light of

27   this record, plaintiff's contention that he suffered mental and emotion anguish from the delay is

28   not sufficient to create a triable issue of fact as to whether the delay caused significant harm.

1    Thus defendant's motion for summary judgment should be granted.

2        Finally, defendant has moved to strike plaintiff's "Supplemental Response in Opposition

3    to Defendants New Evidence in Support of Summary Judgment," filed after defendant's motion

4    was fully briefed by the parties.  (See ECF No. 29.)  Local Rule 230 provides for the filing of a

5    motion, an opposition to the motion, and a reply by the moving party.  There is no provision in

6    the Federal Rules of Civil Procedure or the Local Rules authorizing a plaintiff to file a second

7    opposition or response to a reply, and plaintiff was not granted leave to do so.  Thus the court

8    does not consider this unauthorized filing on summary judgment and declines to take judicial

9    notice of attached documents as requested by plaintiff. [1]  (ECF No. 28.)

10       Accordingly, IT IS HEREBY ORDERED that defendant's motion to strike plaintiff's

11   unauthorized sur-reply (ECF No. 30) is granted.

12       IT IS HEREBY RECOMMENDED that defendant's motion for summary judgment (ECF

13   No. 22) be granted and this case be closed.

14       These findings and recommendations are submitted to the United States District Judge

15   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

16   after being served with these findings and recommendations, any party may file written

17   objections with the court and serve a copy on all parties.  Such a document should be captioned

18   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

19   objections shall be served and filed within fourteen days after service of the objections.  The

20   parties are advised that failure to file objections within the specified time may waive the right to

21   appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

22   Dated:  June 19, 2013

23                                                  Carolyn K. Delaney
                                                   _____
24                                                 CAROLYN K. DELANEY
                                                   UNITED STATES MAGISTRATE JUDGE

25   2 / chan1969.msj

26

27   _____
     [1] Plaintiff has also requested that the court take judicial notice of certain case law (ECF No. 31),
28   which is not a proper subject for judicial notice.  The court has duly considered plaintiff's legal
     arguments, however.